### UNITED STATES of America
### v.
### Lewis C. ECKER, II, Appellant.
### No. 73-1154.

United States Court of Appeals,
District of Columbia Circuit.

May 29, 1973.

As Amended June 7, 1973.

---

Herbert M. Silverberg, Chief, Mental Health Division, Public Defender Service, Washington, D. C., was on the motion for Summary Reversal.

Harold H. Titus, Jr., U. S. Atty., John A. Terry, Oscar Altshuler, Roger C. Spaeder, and Lawrence H. Wechsler, Asst. U. S. Attys., were on the opposition to motion for Summary Reversal.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and MacKINNON, Circuit Judge.

BAZELON, Chief Judge:

Appellant Ecker has moved for summary reversal of the District Court's denial of St. Elizabeths Hospital's recommendation for his conditional release from that hospital on the ground that the trial judge clearly abused his discretion. We deny the motion for summary reversal and, *sua sponte,* summarily affirm the decision below.

On the basis of this record, we find that the hospital's evidence raised sufficient questions about appellant's mental stability and about the adequacy of its own investigation into his mental status to support the trial judge's denial of Ecker's conditional release in February of 1973. This determination does not prejudice future recommendations for conditional release or attempts by the hospital to clarify the questions raised in this record, now five months old.

I.

The facts of this case need be only briefly recited. In 1968, appellant Ecker was acquitted by reason of insanity, in an uncontested proceeding, of the rape-murder of a young Congressional secretary. He was committed to St. Elizabeths with a diagnosis of severe sociopathic personality disturbance, sexual deviance (sadism) with organic features.[1] He spent a total of four years in maximum security in the John Howard Pavilion, and nineteen months in mini-

1. Transcript at p. 61.

mum security prior to the hospital's request for his conditional release.

This request, dated January 4, 1973, encompassed the pursuit of an educational program at a technical institute in Virginia and visits to his parents' home at the discretion of the hospital. A hearing was held on January 30, 1973, in the District Court. Dr. George Saiger, appellant's ward psychiatrist since July of 1971, was the only witness. He testified at length as to appellant's case history and hospital record, and gave his evaluation of Ecker's current mental status. The Government did not oppose the hospital's request for release for schooling,[2] but did oppose the request for visits to Ecker's parental home.

At the conclusion of the testimony and arguments, the District Judge found that Ecker was still suffering from mental illness; and that there were indications that many issues were still unresolved so that appellant, still in turmoil, could not control his impulses. Because of this uncertainty and instability, the judge denied the hospital's recommendation since, "if released into the community, [Ecker] might be likely to injure himself or others." [3]

## II.

■■ While the findings below are not a model of precision or completeness, we think the record offers a sufficient basis for the trial court's determination to withstand appellant's attack under the high standard set for motions for summary reversal.[4] Moreover, we think that the interests of justice are best served by a *sua sponte* affirmance[5] of the trial court since a careful study of the record convinces us that such relief is clearly warranted.

Without exploring and exposing the details of appellant's mental condition at greater length than necessary, we find that the testimony of Ecker's psychiatrist raises not only ambiguities, but real doubts about the sufficiency of the investigation of Ecker's condition, and the conclusions drawn therefrom that he was ready for a dramatic increase in both responsibility and unsupervised leave time from the hospital.

These doubts are raised by three aspects of Dr. Saiger's testimony. First, the extremely short period of time during which Ecker had been without medication.[6] Second, the apparent haste to subject him to psychological testing and the inner turmoil still reflected therein.[7] Third, Ecker's elopement from the hospital shortly after being told to assume a great deal of "responsibility" for his own future.[8]

2. The Government did contend that the conditions for release be "extremely narrowly circumscribed" to permit no time in the community other than bus trips and to provide for careful supervision. Tr. at p. 63.

3. Tr. at p. 66.

4. A party seeking summary disposition bears the burden of "demonstrating both that his remedy is proper and that the merits of his claim so clearly warrant relief as to justify expedited action." United States v. Allen, 133 U.S.App. D.C. 84, 85, 408 F.2d 1287, 1288 (1969). *See also* Ashe v. Robinson, 146 U.S.App. D.C. 220, 450 F.2d 681 (1971).

5. The Government opposed appellant's motion for summary reversal but did not file an opposing motion for summary affirmance.

6. Tr. at pp. 18, 38. Ecker received heavy doses of thorazine at the time of his admission, and had been receiving other unnamed medication until December of 1972. Thus it was conceded that he had been without major tranquilizers for only a month and a half prior to the hearing.

7. Tr. at pp. 44–45. In November of 1972, a psychological tester found continued turmoil in Ecker's unconscious fantasy life. Dr. Saiger explained this by adverting to the fact that the psychologists had asked him to delay the testing because Ecker had begun individual therapy, and because one expects unconscious turbulence in anyone in individual treatment. Dr. Saiger responded that it would not be possible to delay testing since "the notion of school in the spring" was already being discussed.

8. Tr. at p. 14. The connection between the elopement and "dumping" responsibili-

These factors all raise doubts about appellant's reliance on the "down-to-earth persuasiveness" of Dr. Saiger's testimony. They point out at least the need for further observation and information. Furthermore, they call into question the hospital's conclusion that the likelihood of Ecker's being dangerous to others was reduced to such a degree in January so as to permit his extensive, although not unconditional, release. Doubts about the expert's conclusion were reflected in the trial judge's concern that it was still "likely" that Ecker might be dangerous if released into the community.[9] The consequent refusal to allow conditional release at that time, based as it was on the facts and uncertainties revealed by the hospital's evidence, was not without a substantial basis in the record.

### III.

Appellant challenges the validity of the trial judge's exercising such a broad power of review over the hospital's decision to release him. The thrust of this attack is that the differential handling of the release of civilly committed patients from those who, like Ecker, were civilly committed after a finding of not guilty by reason of insanity, deprives the latter of the equal protection of the laws. In Bolton v. Harris,[10] this court upheld the release provisions of D.C.Code § 24–301(e) which require court approval of the hospital's recommendation. We did not think "equal protection is offended by allowing the Government or the court the opportunity to insure that the standards for the release of civilly committed patients are faithfully applied to [so-called "criminally" committed] patients." [11]

Appellant re-asserts the proposition that *any* differential treatment of the release of the two groups of patients violates equal protection. But he fails totally to assert any facts or reasons why the *Bolton* rationale should be abandoned.[12] At best, he argues that the trial court's function must be severely re-

---

ty in Ecker's lap was mentioned by the psychiatrist and is raised in appellant's memorandum at p. 9.

9. This case illustrates, of course, all the difficulties and ambiguities in setting standards for a patient's *conditional* release from St. Elizabeths. Such standards have, unfortunately, received scant judicial attention. This is primarily due to the rapidity with which patients' circumstances can be, and are changed, and the consequent frustration of adequate judicial review. *See* Jackson v. Robinson, 155 U.S.App.D.C. 94, 476 F.2d 539 (Issued March 20, 1973). As we have construed the conditional release provision of D.C.Code § 24–301(e), complete recovery from a mental illness is not required. Indeed, for some patients conditional release may be an important and essential part of "recovery." To approve such release, "the court must conclude that the individual has recovered sufficiently so that under the proposed conditions . . . 'such person will not in the reasonable future be dangerous to himself or others.'" Hough v. United States, 106 U.S.App.D.C. 192, 195, 271 F.2d 458, 461 (1959).

Whether this interpretation continues to be sound may be open to future examination. It is clear, however, that the nature of the conditions set for release play an important part in a determination of "sufficient" recovery and lack of dangerousness. Since neither determination may ·be capable of absolute precision or certainty, the standards are elusive. It is important, therefore, that both the hospital and the trial court elucidate with specificity those factors which weigh heavily in their decisions. Only by such explication on the record can there develop standards for review of conditional release decisions more meaningful than merely the "persuasiveness" of psychiatric testimony.

10. 130 U.S.App.D.C. 1, 395 F.2d 642 (1968).

11. *Id.* at 11, 395 F.2d 652.

12. "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620 (1966). *See* Bolton v. Harris, 130 U.S.App.D.C. at 10, 395 F.2d at 651.

stricted to the limited review of an essentially "medical" judgment, along the lines of the standard set forth in Tribby v. Cameron.[13] That the issue of what standard of review should be applied to release decisions is a question of constitutional dimensions is beyond dispute. This court is continually called upon to test the validity of the substantive and procedural terms of commitment against the requirements of the Constitution.[14] Moreover, it does seem relevant to examine more closely the statutory requirements of D.C.Code § 24–301 in light of current developments in the law.[15]

However, this case does not provide the opportunity to do so. Even under the standard outlined in *Tribby*, that the court assess whether the hospital has made a "permissible and reasonable decision in view of the relevant information and within a broad range of discretion," the trial court's judgment must be sustained. In the record before us, we find to be crucial the lack of extremely relevant information concerning the termination of Ecker's medication. Not only is this important factor virtually brushed off by the psychiatric expert, but the period of time elapsed since the termination appears to us too short to provide any opportunity for adequate observation.[16] We have noted previously the relevance of this type of medication to psychiatric evaluations of mental status[17] and we find that the failure to

deal with this issue undermines the "reasonableness" of the hospital's decision. Similarly, we note that the recommendation for conditional release was based on only five months of liberalized privileges since Ecker's elopement. Such a time span raises further doubts about whether the hospital's decision was based on adequate relevant information.

## IV.

■ We have decided to take the somewhat unusual step of affirming the judgment in this case *sua sponte* for a variety of reasons. First, because we are convinced that the standard for summary disposition is met, on this record, by the Government. Second, we see no real prejudice to the rights of appellant in so doing. The emergency nature of appellant's motion—to obtain release for schooling in February—has already been frustrated. Rather than simply deny summary reversal and allow the appeal to follow its normal course, it will better serve the interests of justice to terminate now what we would see to be a process which could not in the end provide the relief requested and might therefore only waste both the parties' and the court's resources.

Moreover, our affirmance should in no way be interpreted as foredooming future recommendations for conditional release. We respect St. Elizabeths' obvious efforts to secure a meaningful ed-

---

13. "We do not decide whether the agency has made the best decision, but only make sure that it has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion." 126 U.S.App.D.C. 327, 328, 379 F.2d 104, 105 (1967). For a discussion of the types of decisions calling for different standards, *see* Dixon v. Jacobs, 138 U.S.App.D.C. 319, 427 F.2d 589, 597 (1970).

14. *See, e. g.,* In re Ballay, 157 U.S.App. D.C. ——, 482 F.2d 648 (Issued May 31, 1973); Waite v. Jacobs, 154 U.S.App. D.C. 281, 475 F.2d 392 (Issued March 8, 1973); Jackson v. Robinson, *supra* note 9.

15. *E. g.,* Jackson v. Indiana, 406 U.S. 715, 729, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).

16. Not only is the change in dosage levels virtually ignored, Dr. Saiger offered no explanation as to why he doubted medication was ever necessary in this case. Tr. at p. 38. This is not to intimate any judicial views on the psychiatric treatment Ecker received. The point is that the issue of medication was passed over, and we are not convinced either of its irrelevance, or of the hospital's implicit conclusion that 4–6 weeks was a sufficient span of time to observe Ecker's adjustment to the withdrawal of medication.

17. United States v. Bennett, 148 U.S.App. D.C. 364, 460 F.2d 872 (1972).

ucational experience for this patient and we would urge that these efforts not cease. There is nothing finally determined by the denial of conditional release—particularly so in this case where the record raised questions and doubts which can, and may, be readily answered by the passage of time. Refusal by the court to allow release as of January in no way prejudices future attempts, and should not discourage the hospital from seeking release arrangements for its patients.

■ If we were not convinced of the good faith of the trial judge in considering the hospital's recommendations solely in light of the statutory standards for conditional release, we would be more deeply troubled by his reference at the hearing to the length of prison term to which Ecker might have been sentenced had he been convicted of murder. Ecker was not found to be legally responsible for his acts, he was not convicted, and he is not being punished. No considerations other than the terms of his release, his mental condition, and the possibility of dangerousness to himself or others should influence the decisions of either the hospital staff or the court. In this regard, we were appalled to read in the record that Dr. Saiger was instructed to contact the Senate Office in which Ecker's victim had worked prior to her death to find out if Ecker's release would "bother" anybody, a matter wholly irrelevant to the decision to be reached by those charged with responsibility in the matter.[18] And we assert again that the theoretical limits of Ecker's theoretical imprisonment are of no relevance in determining whether he should be conditionally released from the hospital.

The motion for summary reversal is denied, and the judgment is

Affirmed.

18. It was also brought out by Ecker's psychiatrist that he felt Ecker had been treated "special in reverse" because of his advantageous background. Tr. at pp.

6–7. We hope it is unnecessary to state that this factor too should have no bearing on the determination to seek Ecker's release.